26 N.J. Super. 498 (1953)
98 A.2d 134
SHIRLEY V. STANBERY, PLAINTIFF,
v.
AETNA LIFE INSURANCE COMPANY, A CORPORATION, DEFENDANT.
Superior Court of New Jersey, Law Division.
Decided June 29, 1953.
*500 Mr. Albert S. Gross, attorney for the plaintiff.
Messrs. Emory, Langan & Lamb, attorneys for defendant (Mr. Raymond J. Lamb and Mr. Berkeley Cox of the Connecticut bar, of counsel, and Mr. Samuel M. Lyon, Jr., on the brief).
LEYDEN, J.S.C.
This action, to recover double indemnity benefits under a policy of life insurance, was submitted to the court for determination on an agreed stipulation of facts.
On October 24, 1936 plaintiff's decedent, William H. Stanbery, then a clerk employed in the ticket office and baggage room of the L. & N.R.R. Depot, Etowah, Tennessee, entered into a life insurance contract with the Aetna Life Insurance Company, in the face amount of $1,000 for an annual premium of $23.37. The beneficiaries originally named were the parents of the insured. Subsequently Stanbery substituted his wife, Shirley V. Stanbery, the plaintiff, as the beneficiary.
In consideration of an additional annual premium of 77 cents, defendant further agreed:
"If the death of the insured occurs before default in payment of premium and before the first anniversary of the date of this policy which follows the sixty-fifth anniversary of the insured's birth, and if such death results directly and independently of all other causes from bodily injuries effected solely through external, violent and accidental means and occurs within ninety days from the date of such accident, and if such injuries are evidenced by a visible contusion or wound on the exterior of the body (except in the case of drowning and internal injuries revealed by an autopsy), and if such death does not result from suicide while sane or insane, from military or naval service in time of war, from an aeronautic flight or submarine descent, from the taking of poison or inhaling of gas whether voluntary or otherwise, nor directly or indirectly from disease in any form, then the Company will immediately pay a sum equal to the sum described in this policy as the sum insured in addition to the insurance under this policy.
*501 The Company shall have the right and opportunity to investigate the circumstances of death, to examine the body and, if not prohibited by law, to make an autopsy."
After the issuance of said policy the insured entered the military service of the United States. On March 27, 1952, while serving as a captain in the United States Army in Korea, he was accidentally killed by a mine explosion while on reconnaissance for a company camp site.
Upon being notified of his death in Korea plaintiff made application for payment under said policy. The defendant paid her the sum of $1,001.36, being the face amount of the policy, with interest. Plaintiff made demand for further payment under the double indemnity provision, which demand defendant refused on the ground that insured's death resulted from military service in time of war within the intent and meaning of the exclusions contained in said provision. Hence this action, wherein the plaintiff seeks as damages the sum of $1,000, with interest from the 27th day of March 1952.
The interpretation of the so-called "war clauses" has given rise to much litigation both within and without our State. The cases construing these clauses in life insurance policies seem to fall into two categories: (1) "result clauses," which exclude from coverage death which results from military service in time of war; and (2) "status clauses," which exclude from coverage death from all causes while in military service in time of war. With this distinction we are not concerned as it is admitted that Stanbery's death resulted from military service. The question for determination is whether Stanbery died "in time of war" within the intent and meaning of the contracting parties as expressed in the insurance policy.
Some of our sister states hold to the view that insurance policies are sui generis, and the principles of law applicable to the interpretation of ordinary contracts do not apply. Our courts have consistently refused to adopt this view.
A policy of insurance is simply a contract, and its provisions should be interpreted as in any other contract, Caruso *502 v. John Hancock, etc., Insurance Co., 136 N.J.L. 597 (E. & A. 1948), and enforced in accordance with its plain provisions. Precipio v. Insurance Company of Pennsylvania, 103 N.J.L. 589 (E. & A. 1927); Vozne v. Springfield Fire, etc., Insurance Co., 115 N.J.L. 449 (E. & A. 1935).
The basic rule of construction of contracts is to ascertain and determine the intention of the parties as of the time of the making of the contract as expressed by the language employed when read and considered as a whole. Verhagen v. Platt, 1 N.J. 85 (1948). It does not lie within the province of the court to re-write or distort a contract, or to make a better contract for the parties than they themselves have seen fit to do, or to alter it for the benefit of one to the detriment of the other under the guise of judicial construction. Kupfersmith v. Delaware Insurance Company, 84 N.J.L. 271 (E. & A. 1913). Where, however, a provision in the contract is ambiguous, so that the intent of the parties is not clear, it will be construed most strongly against the insurer, since it was the draftsman of the agreement. Caruso v. John Hancock, etc., Insurance Co., supra. But if, when the words of a policy of insurance are given their ordinary and usual meaning no ambiguity results, the court will not resort to a strained, distorted or technical construction. Jorgenson v. Metropolitan Life Insurance Company, 136 N.J.L. 148 (Sup. Ct. 1947).
Plaintiff contends the clause "* * * and if such death does not result * * * from military or naval service in time of war * * *" is ambiguous in that it is not clear whether the contracting parties intended a constitutionally declared war or undeclared war, and argues the insured's death did not occur "in time of war," since the conflict in which the United States has been and still is engaged in Korea is not a war but merely "a police action"; that under the Federal Constitution, Article I, Section 8, paragraph 11, the power to declare war is vested exclusively in the Congress, and the Congress has not formally declared war on North Korea or Red China; that the ambiguous clause should be construed most strongly against the defendant and in favor *503 of the plaintiff, and in effect distorted to read "* * * from military or naval service in time of a constitutionally declared war."
Plaintiff finds support, and in fact, relies heavily upon Beley v. Pennsylvania Mutual Life Insurance Co., 373 Pa. 231, 95 A.2d 202 (Pa. Sup. Ct. 1953), for this contention.
In the Beley case the Supreme Court of Pennsylvania, by a four to two vote, held the conflict being waged in Korea is not a war within what may be termed the constitutional or legal sense of that word, and permitted recovery of double indemnity benefit for death of a soldier killed in action in Korea. The opinion of the highest court of a sister state on a similar question is entitled to great respect. However, a reading of the majority and dissenting opinions in that case will demonstrate that the Supreme Court of Pennsylvania gave a legalistic, technical construction of the word "war." Our courts have given the word a realistic interpretation when used in private contracts or documents. See O'Neill v. Central Leather Co., 87 N.J.L. 552 (E. & A. 1915), affirmed Oetjen v. Central Leather Co., 246 U.S. 297, 38 S.Ct. 309, 62 L.Ed. 726 (1918); Jorgenson v. Metropolitan Life Insurance Co., supra; Caruso v. John Hancock, etc., Insurance Co., supra; Feick v. Prudential Insurance Co., 1 N.J. Super. 88 (App. Div. 1948); Glantz v. Willow Supply Co., 139 N.J. Eq. 523 (Ch. 1947); Schaffer v. Oldak, 12 N.J. Super. 80 (Ch. Div. 1951); Berg v. Berg, 13 N.J. Super. 479 (Ch. Div. 1951); Publix Asbury Corporation, Inc., v. City of Asbury Park, 18 N.J. Super. 286 (Ch. Div. 1951), affirmed 18 N.J. Super. 192 (App. Div. 1952), certification denied 9 N.J. 609 (1952); contra, Feil v. Senisi, 7 N.J. Super. 517 (Law Div. 1950), a statutory interpretation.
I find no ambiguity in the clause, "* * * and if such death does not result * * * from military or naval service in time of war * * *." Giving to the words their ordinary and usual meaning, certainly a captain in the United States Army on active duty is in military service.
*504 In determining the ordinary and usual meaning of the word "war" there are a number of definitions which might be quoted. A few will suffice. The New Century Dictionary (1940 ed.), vol. 2, page 2172, defines "war" as follows: "Conflict carried on by force of arms, as between nations or states ("international war" or "public war") or between parties within a state ("civil war"); warfare (by land, by sea, or in the air); also, a contest carried on by force of arms, as in a series of battles or campaigns (see phrases below); hence in general, conflict, or active hostility or contention; a contest, a struggle, or contention. * * *" In the Prize Cases (the Amy Warwick, 2 Black 635, 67 U.S. 635, 17 L.Ed. 459 (Sup. Ct. 1862), the court defined "war" as follows:
"War has been well defined to be, `that state in which a nation prosecutes its right by force.'"
In 56 Am. Jur., page 133, section 2, "war" is defined as follows:
"War is an armed struggle or contest by force carried on for any purpose between two or more nations or states exercising at least de facto authority over persons within a given territory and commanding an army prepared to observe the ordinary laws of war."
In Dole v. Insurance Company, 51 Me. 465 (Sup. Ct. 1863), the court said at page 470:
"Every forcible contest between two governments de facto or de jure is war. War is an existing fact and not a legislative decree."
Some of the authorities on international law have defined the word "war" as follows:
"War is essentially a struggle between states, involving the application of force." Wheaton's International Law (6th ed., Keith, 1929), 630.
"War is the contention between two or more states through their armed forces for the purposes of overpowering each other and imposing such conditions of peace as the victor please." Oppenheim's International Law (6th ed., Lauterpacht, 1944), sec. 54.
*505 "When differences between states reach a point at which both parties resort to force, or one of them does acts of violence which the other chooses to look upon as a breach of the peace, the regulation of war is set up, in which the combatants may use regulated violence against each other until one of the two has been brought to accept such terms as his enemy is willing to grant." Hall, A Treatise on International Law (6th ed., Atlay, 1909).
Funk & Wagnalls New Standard Dictionary (1946) defines "war" as follows:
"A contest, as between nations or states, or between different parties in the same state, carried on by force and with arms, commonly either for defense, for avenging insults and redressing wrongs, for the extension of commerce and acquisition of territory, or to obtain and establish the superiority and dominion of one of the belligerents over the other; also, the condition of things created by such a contest."
O'Neill v. Central Leather Co., supra, quoting Professor Beale, defines war as follows (9 Harv. L. Rev. 407):
"War, in law, is not a mere contest of physical force, on however large a scale. It must be an armed struggle, carried on between two political bodies, each of which exercises de facto authority over persons within a determinate territory, and commands an army which is prepared to observe the ordinary laws of war."
The word "war" when used in a private contract or document should not be construed on a public or political basis, in a legalistic or technical sense, but should be given its ordinary, usual and realistic meaning, viz., actual hostilities between the armed forces of two or more nations or states de facto or de jure. Schaffer v. Oldak, supra; O'Neill v. Central Leather Co., supra.
The conflict still raging in Korea is a war in the ordinary and usual meaning of the word, and it was such on March 27, 1952, when the insured met his untimely death. See Weissman v. Metropolitan Life Insurance Co., 112 F. Supp. 420 (D.C.S.D. Cal. 1953). To hold otherwise and rule the Korean war is not a war seems to me inexplainable and absurd. Borrowing the language of Mr. Justice Bell in his *506 dissenting opinion in the Beley case, supra [373 Pa. 231, 95 A.2d 207]:
"This will shock millions and millions of American citizens and especially Korean veterans and their families. Every man, woman and child in America is informed by the newspapers and radio and knows that there are many thousands of American soldiers, sailors, marines and airmen who are now and for several years have been engaged with soldiers of North Korea and of China in open actual warfare. Our Navy is constantly patrolling and bombarding the coasts of North Korea; our Air Force is having daily dog fights with the enemy, and our soldiers are daily killing the enemy and being killed. We have for over two years been engaged in negotiations for a truce and are vainly trying to exchange prisoners of war. The United States casualties exceed 128,000. How is it humanly possible to say that the Korean War is not war? * * * In this case the mere fact that President Truman has declared the Korean War to be a `police action' does not, irrespective of his motives, make it so in construing a private contract of insurance. Although for political or international reasons, or to save the `position' of their leader, the majority in Congress have not formally declared war against the North Koreans or Red China, the Congress (as well as every person in the civilized world) knows that the United States is at war in Korea. See for example, the Veterans' Readjustment Assistance Act of 1952, Public Law 550, U.S. Code Congressional and Administrative News 1952, pp. 629-655, 38 U.S.C.A., sec. 901, et seq.; and the 1952 Amendment to the Veterans' Compensation Rates statute, Public Law 427, U.S. Code Congressional and Administrative News 1952, p. 290, 38 U.S.C.A., sec. 473, 478, 480, Veterans' Regulation No. 1 (a), pt. 1, par. 2. In the legislative history of the Veterans' Compensation Rates statute of 1952 it is said, pages 1784-1785: `Your committee * * * believes that the bill, as amended, will provide uniformity for veterans of all wars insofar as it deals with statutory awards for the more seriously disabled groups. * * * All the provisions of this bill apply entirely and exclusively to service connected veterans of the Spanish-American War Group, World Wars 1 and 2 and veterans of service on or after June 27, 1950.' (Date of Korean conflict.) Congress has also made provision for the use of United States troops in Korea by making appropriations totaling billions of dollars, Public Law 843, 81st Congress, Supplemental Appropriation Act of 1951, 64 Stat. 1054. Furthermore, the Revenue Act of 1950 provides for certain income tax exemptions for members of the Armed Forces serving in combat zones, Korea being, of course, in this category. Public Law 814, 81st Congress, sec. 202, 26 U.S.C.A., sec. 22(b) (13), 1621 (a), 1625(a), 1633(a). But all of this deals with political questions and with issues arising thereout; it does not deal with private contracts and their meaning and intent."
*507 To date, the Department of Defense as of May 1, 1953 announced (Report No. 423-53) 23,958 deaths, 97,937 wounded in action, and 11,368 missing in action of United States military personnel in the Korea area. It is also common knowledge that as to troop participation, 61% are from the Republic of Korea, 34% from the United States of America, and 5% from all other United Nations members. In addition, the war in Korea has cost the people of the United States 22 billion dollars.
The clause in question is clear and perfectly plain.
"The purpose of such a clause is not insidious or difficult to understand. Military or naval service in time of war, whether in training or combat, is admittedly hazardous, fraught with incalculable danger. It is difficult to determine the scope of risks assumed by members of the armed forces in view of the methods of warfare, keeping in mind the possible devastation of present and future developments. An insurance company has the right to limit its liability to particular risks. If it will only assume risks which it feels can be calculated and clearly and plainly so states, this court will not increase such liability." Jorgenson v. Metropolitan Life Insurance Co., supra.
Such is the situation here.
I find and determine that the insured's death resulted from military service in time of war within the intention of the parties as expressed by the language employed in the exclusion clause of the double indemnity provision of the insurance contract, and the judgment is in favor of the defendant Aetna Life Insurance Company, and against the plaintiff Shirley V. Stanbery.